**Ruth MURPHY, Appellant,**

v.

**BOARD OF ZONING ADJUSTMENT OF the CITY OF KANSAS CITY, Missouri, Respondent,**

and

**John Thornberry and George Tucker, Intervenor-Respondents.**

**No. KCD 30233.**

Missouri Court of Appeals, Western District.

Dec. 31, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 4, 1980.

Application to Transfer Denied March 11, 1980.

Robert A. Kumin, Inc., Kansas City, for appellant.

Aaron A. Wilson, City Atty., Kathleen A. Hauser, Asst. City Atty., Kansas City, for Bd. of Adjustment.

James C. Wirken, Spradley, Wirken & Readey, Kansas City, for Thornberry and Tucker.

Before WASSERSTROM, C. J., and PRITCHARD, DIXON, SOMERVILLE, TURNAGE, MANFORD and KENNEDY, JJ.

TURNAGE, Judge.

Ruth Murphy was denied a certificate of occupancy which would allow property at 18–20 Janssen Place in Kansas City to be occupied by eleven living units. She appealed this decision of the commissioner of buildings and inspections to the Board of Zoning Adjustment. The Board conducted a full hearing at which evidence was adduced by Murphy and by residents of Janssen Place who opposed the granting of the certificate. The Board upheld the denial of the certificate of occupancy. Murphy brought certiorari in the circuit court and that court affirmed the Board. On this appeal, Murphy contends the Board's decision was based upon hearsay evidence and not upon substantial and competent evidence upon the whole record; the Board erred in admitting evidence; the Board failed to give proper notice of the hearing; the commissioner of buildings and inspection failed to make a required inspection; and the Board's decision was against the weight of the evidence. Affirmed.

This case was argued and submitted to a division of this court and an opinion adopted. That opinion was withdrawn and the case was reargued and submitted to an expanded panel.

Murphy filed an affidavit with the Board and testified in person. In her affidavit she stated the property at 18–20 Janssen Place had two buildings—a main building with 30 rooms and 12 baths, of brick and masonry construction, and a carriage house of brick and masonry construction, built in an "L" shape, about 63 × 60 feet. She stated the non-conforming use was established prior to June 4, 1933, the date the Kansas City zoning ordinance in question was adopted, with two living units on the first floor in the main building, three rental units on the second floor and two rental units on the third floor. The carriage house had four rental units. She stated this multiple living unit occupancy continued without interruption from 1933 to the date of the hearing held by the Board in 1976.

In her testimony before the Board, Murphy stated the house was built by Pickering, her great uncle, and she first went to the house in 1925. She stated that at least since September, 1930, the carriage house had been occupied by four apartments and the main house had two living units on the first floor, three on the second floor, and rental units on the third floor. Murphy also introduced the affidavit of Birdie Sharples who was deceased at the time of the hearing. This affidavit stated that since 1930 there were rental units in the main building on all three floors and in the carriage house and there had been no abandonment of this rental occupancy. Murphy also introduced the affidavit of Mrs. Pickering which stated that before and since 1930 the buildings had been occupied by tenants of her deceased husband and herself.

Murphy also introduced the affidavit of Bea Billingsley which stated she had lived at the property from 1938 to 1952 and during that entire time the main building and carriage house had been occupied by rental tenants. The affidavit stated the carriage house had always had four units. The affidavit of Della Hill was introduced by Murphy which stated she lived on the property from 1932 to 1957. She lived in an apartment in the carriage house and there were various other units in the carriage house and the main house.

Luther Boyt testified before the Board on behalf of Murphy. He stated he was at that time living in the main house at 20 Janssen Place and he used to live in the carriage house. He stated he started living there in 1966, but first became familiar with the property in 1955. He knew there were other people living there because he saw them and talked with them. With this testimony Murphy rested her presentation.

On behalf of the opponents, Donald Chisholm, an attorney in Kansas City, testified that he first became involved with 20 Janssen Place in 1957 when he was contacted by an attorney in Iowa after the death of a Dr. Kinney. He stated there was nothing to be done at that time concerning the property because it was in the joint names of Dr. Kinney and his wife. When Mrs. Kinney died in September, 1958, he handled her estate. He learned from the abstracts that the Kinneys had owned the property since 1935. He stated the gross estate was valued at about $2,400,000. He made a visit to the property with the inventory appraisers from the probate court and went through the main building and the carriage house to make a room-by-room inventory. He stated the inventory covered twenty-one pages, including one page of antiques and valuable oriental rugs. He stated in 1958 Mrs. Hill, who apparently was the Della Hill mentioned in the affidavit introduced by Murphy, was a long time acquaintance and former employee of the Kinneys and with her husband, occupied an apartment in the main house which was a caretaker's apartment. He said there was one apartment in the carriage house which had customarily been used by a gardener. He stated there were no tenants in the house when Mrs. Kinney died and no tenants occupied the property during the course of the administration of Mrs. Kinney's estate from September, 1958, to April,

1959. He stated when he went through both buildings he did not find any evidence of any units for rental purposes nor did he hear any reference to rental units existing on the property. He stated the whole house was furnished with lovely furniture.

John Thornberry testified that he had lived across the street from 20 Janssen Place since 1942. He stated when he moved into his home the Kinneys had just moved to Iowa and left 20 Janssen Place permanently. He said Mr. and Mrs. Hill lived in the main house and a man named Curtis was the yard man and he lived in the garage or carriage house. Mr. Thornberry stated he did not see or know or hear of any rental use of the property from 1942 until Mrs. Murphy acquired her ownership.[1]

Mrs. Hetzel stated she moved into Janssen Place in June, 1955, and lived directly across the street and one house over from 20 Janssen Place. She stated she had a child in the years 1957 and 1958, and was home most of the time and was out of doors with her children a lot. She stated she talked with the caretakers who lived in the house, and on one occasion went through the house with her husband. She stated at that time the house was filled with beautiful furniture and there was only one kitchen. She went into the garage and it had a space on the ground floor big enough to accommodate two or three cars, with a turntable built in the floor to turn the cars around. She stated no one lived in the garage except the caretaker who lived upstairs. She stated the carriage house or garage did not consist of four apartments. Mrs. Hetzel stated she was familiar with the property for at least three years and about three years after first going through the house, she went through as a prospective buyer. During her second tour through the house it still had only one kitchen. After she looked at the house as a prospective buyer, she saw some additions put on the house.

Doris Parker testified that she looked at the property as a prospective buyer in 1957 with a real estate saleslady. She stated the downstairs was very well furnished, but there was no furniture at all upstairs. She saw only one kitchen in the entire house and that was on the first floor.

George Tucker testified that he lived at 80 Janssen Place and offered some testimony concerning city directories, which was objected to. However, he did state that he had seen 20 Janssen Place turned into a multi-family use in 1960 when he started to see an increase in the number of people there.[2]

Mrs. Murphy testified in rebuttal that she built an exterior stairway in 1959 after she had acquired the property for her mother and sister. She stated she acquired the property in her own name in 1961.

Murphy first contends the decision of the Board was based on hearsay and other improperly admitted evidence which did not

---

1. After Thornberry made a statement an objection was made that his testimony went beyond what he had seen and was not based on fact. The dissent fails to note that the following then occurred:

"CHAIRMAN: Excuse me, Mr. Thornberry, clarify counsel's objections, as to the time you actually occupied, I believe you occupied the premises?

"MR. THORNBERRY: At 20? No, I never occupied any premises at 20. I just knew of the people who lived there because I lived across the street at 61 Janssen Place from 1942 until now. I live there now.

"CHAIRMAN: So will you state for the record to response [sic] to counsel's objections that you were speculating, that you had no personal knowledge. Did you have personal knowledge?

"MR. THORNBERRY: I would say that I had personal knowledge of this, I did not see, or know of, or hear of any rental use of that property after 1942 until Mrs. Murphy acquired it." [Murphy supplied this date as 1959.]

2. After referring to city directories, Tucker testified, ". . . when it actually changed when it turned to multi-family it was 1960. When we started to see an increase in the number of people in Number 20 Janssen Place." An objection was directed only at his reference to information contained in the city directories. No objection was directed at his clear statement that he first observed multi-family use of this property in 1960.

amount to substantial and competent evidence sufficient to support a finding that Murphy had failed to establish a lawful non-conforming use of the property by eleven living units.

It should first be observed that the burden to prove a lawful non-conforming use was upon Murphy. *Bartholomew v. Board of Zoning Adjustment*, 307 S.W.2d 730, 733[7] (Mo.App.1957). To constitute a lawful non-conforming use the ordinance requires that the property must have been used for eleven living units from 1933 to 1976 without a continuous twelve-month interruption. *Bartholomew* further holds that hearsay evidence and conclusions based upon hearsay will not qualify as competent and substantial evidence upon the whole record to support a final decision by the Board. 307 S.W.2d 733[6]. In examining the record to determine if the decision of the Board is supported by substantial and competent evidence upon the whole record, this court "must view the record in a light most favorable to the findings of the tribunal considering the favorable inferences which the tribunal had a right to draw from the evidence before it, . . ." *Brooks v. General Motors Assembly Division*, 527 S.W.2d 50, 53 (Mo.App.1975). Article 5, Section 22 (now Section 18) of the Constitution, sets out the scope of review and requires that the decision of the Board be supported by competent and substantial evidence upon the whole record. Of course, this court may not substitute its judgment for that of the Board. *Brooks* at page 53.

In stating the evidence presented to the Board, set out above, this court has not included the evidence introduced by the opponents consisting of hearsay by way of affidavits of people not present and testimony regarding the contents of city directories. Anomalous as it may seem, Murphy introduced a number of affidavits, as already mentioned, but strenuously objected to the introduction of any affidavits on the part of opponents. This court purposely omitted any reference, in the statement of facts contained herein, to that evidence which Murphy contends was hearsay or otherwise inadmissible.

It is apparent from the facts already stated that the decision of the Board rested upon much more than hearsay, irrelevant or other improperly admitted evidence as Murphy contends. There was competent and substantial evidence from which the Board could have found that even if the property were used for eleven living units in 1933, such use was interrupted for more than twelve continuous months between 1942 and 1960. Thornberry testified the property was not used by tenants between 1942 and the time when Murphy acquired her ownership, which was 1959 when she acquired the property for her mother and sister. Tucker testified tenant use started in 1960. A fair inference from the testimony of Mrs. Hetzel indicated non-tenant use between 1955 and 1958. This was corroborated by Mrs. Parker in her observation of the property in 1957, and by Chisholm as to the period from September, 1958, to April, 1959. It is true Mr. Thornberry and Mr. Tucker did not state they had actually been in the buildings at 20 Janssen Place, however, "[p]robative circumstantial evidence is sufficient to establish facts, . . ." *State v. Morris*, 359 Mo. 194, 221 S.W.2d 206, 209[5–7] (Mo.1949). Certainly their evidence that they lived in the neighborhood and did not see any outward evidence of the property being occupied by tenants until 1959 or 1960 was circumstantial evidence from which the Board could infer that such use was not in fact being made of the property between 1942 and 1959. In view of all of the evidence, direct and circumstantial, summarized herein, it cannot be said that the decision of the Board was based upon hearsay or other improperly admitted evidence.

Murphy next complains that the Board failed to exclude hearsay evidence offered by the opponents. In *Bartholomew* this court reviewed a record which revealed the Board had received improper evidence. This court noted such evidence was hearsay and should not have been received and would not be considered by the court in its review. This court has followed the same

procedure and has reviewed the evidence without reference to the evidence to which Murphy objects. While such ·evidence should not have been received by the Board, it is not considered by this court in the determination that the decision of the Board is supported by substantial and competent evidence.

■■■ Murphy next complains about the notice given of the hearing to be held by the Board of Adjustment. The notice stated: "Appeal from decision by the codes administration property is in violation of the zoning ordinance." Section 65.330 of the ordinances of Kansas City requires the notice to set forth the general purpose of a hearing to be held by the Board. Murphy argues that this notice would simply advise that a hearing was to be held to determine if the property was in conformity with the applicable two-family zoning. Murphy contends the notice did not advise all interested parties of the true purpose of the hearing, which was to determine whether or not there was a legal non-conforming use under which this property could be occupied by eleven living units. Murphy has not cited any authority in support of her contentions. The notice did appear to at least advise of the general purpose of the hearing and that was to determine whether the use of this property was in violation of the zoning ordinance. Non-conforming use is an affirmative defense which may be asserted against a contention that property is being used contrary to an applicable zoning ordinance. *Bartholomew* at 733[7]. Thus, the ultimate question was whether or not the property was in violation of the applicable zoning ordinance with Murphy asserting the affirmative defense of non-conforming use. She does not claim she was deprived of any evidence available to her by reason of the wording of the notice. In short, no prejudice is claimed or shown resulting from the claimed deficiency in the notice. The notice was sufficient to comply with the requirements of the ordinance.

■■■ Murphy contends the commissioner of buildings and inspection failed to conduct an investigation of her claim of non-conforming use in violation of an ordinance requiring such investigation. The commissioner denied the certificate of occupancy and Murphy thereafter appealed to the Board of Adjustment. On that appeal the matter was heard de novo. In that situation only the proceedings before the Board are open for review on this appeal. *Davis v. O'Bryant*, 175 S.W. 931, 932[2, 3] (Mo. 1915). Further, the constitution authorizes this court only to review the decision of the Board to determine if its finding is supported by substantial and competent evidence upon the whole record. Any failure on the part of the commissioner to make an investigation prior to the hearing conducted by the Board is beyond the scope of review of this court.

■■■ Murphy contends the decision of the Board was against the great weight of the credible evidence. This court may review the Board's findings and set aside the decision of the Board even if supported by competent and substantial evidence if such decision is found to be contrary to the overwhelming weight of the evidence. *Brooks* at page 53. But, as *Brooks* points out, "the weight of the evidence is not the quantity or the amount thereof. Rather it is the weight and probative value; its effect in inducing belief." A review of the evidence before the Board fails to convince this court that the Board's decision is against the great weight of the evidence. While it is true there were certain inconsistencies in the testimony and some of the witnesses may have been contradictory in some respects, still the credibility of the witnesses was for the Board to determine. *Mo. Church of Scientology v. State Tax Comm.*, 560 S.W.2d 837, 843[7, 8] (Mo. banc 1977).

The only evidence offered in support of Murphy's contention that the property had been used for eleven living units for forty-three years was the affidavit of Murphy herself.[3] The evidence in opposition thereto

---

**3.** The only live witnesses on behalf of Murphy were herself and Boyt. None of the affidavits stated the number of rental units in the house and carriage house, nor did Boyt.

was substantial and competent. Viewing the evidence as this court must, in the light most favorable to the findings of the Board and considering that the credibility of the witnesses is for the Board's determination, it cannot be said the finding and decision of the Board is unsupported by substantial and competent evidence nor against the weight of the credible evidence. This court finds the decision of the Board was supported by ample evidence that a lawful non-conforming use of 20 Janssen Place without a continuous twelve-month interruption was not shown.

The judgment is affirmed.

WASSERSTROM, C. J., and DIXON and KENNEDY, JJ., concur.

MANFORD, J., dissents in separate dissenting opinion.

PRITCHARD and SOMERVILLE, JJ., dissent and concur in dissenting opinion of MANFORD, J.

MANFORD, Judge, dissenting.

I respectfully dissent because I cannot agree with the majority opinion, which concludes the evidence herein to be competent and substantial enough to affirm the ruling of the respondent, Board of Zoning Adjustment of Kansas City, Missouri, hereinafter referred to as the Board.

This is an appeal stemming from action by the circuit court in upholding the ruling of the Board and of course, lies in the nature of review of an administrative hearing.

Before taking up the prime issue of competent and substantial evidence, it must be pointed out that legal nonconforming use, as applicable herein, is not an affirmative defense. The case cited in the majority opinion, *Bartholomew v. Board of Zoning Adjustment*, 307 S.W.2d 730 (Mo.App.1957), by virtue of its particular factual circumstances, placed the question of legal nonconforming use in the posture of an affirmative defense. Such is not the case herein, rather, appellant, as part of her case, had

the burden of proof of that issue. This question, in the majority opinion, overlooks the point made regarding the notice of the Board hearing.

Appellant had made application for a certificate of legal nonconforming use. The failure of the City Codes Administrator to perform his duty, and hence to word the notice in such a manner that appellant's use of her property was in violation of the zoning ordinances, did not, as properly contended by appellant, join the real issues in this case. The result, of course, is that the notice made it appear that the proceeding was one based upon citation for an unlawful use of property, when in reality, the issue was the entitlement or refusal of a certificate of legal nonconforming use.

Under the ordinances of the City of Kansas City, Missouri, the officer, known as the Codes Administrator, has certain prescribed duties to perform relating to application for a certificate of legal nonconforming use. That ordinance reads as follows:

"(8) Any existing nonconforming use established as such, prior to and existing continuously from June 4, 1933 to the effective date of this amendment, shall be presumed to be a legal nonconforming use.[1]

*Any existing building, structure or use made nonconforming as to bulk or use by any amendment to this ordinance on or before the effective date of the amendment, shall have a period of one year from the date said building, structure or use is made nonconforming to obtain a certificate of occupancy from the commissioner of Buildings and Inspections as provided by Section 65.230(7)(c). The new nonconforming use shall be made a part of the record during the adoption of any such amendment and the owner of record of the property shall be notified of this requirement.*

*Within thirty (30) days after the effective date of any amendment of this ordinance, adopted after the effective date of this amendment, which shall render any*

---

1. See also Kansas City, Missouri Rev. Ordinances, Chapter 65, § 65.230(7)[a], [b] and [c].

existing building, structure or use non-conforming as to bulk or use, the Director of City Development shall publish a public notice in a daily paper, twice, on two successive weeks, apprising all property owners and persons affected by the ordinance amendment, known or unknown, of the provisions of this section and the requirement that an application for a certificate of occupancy is required pursuant to this section within the one year period set forth in this section. The Director of City Development shall also send by certified mail return receipt requested, a copy of such public notice, to the property owners or persons affected, of every building, structure or use, actually known by the Director to be affected by the amendment to the ordinance resulting in nonconformity as to use or bulk, and shall post a copy of said public notice at two conspicuous places on the building, structure or use.

Each property owner or person affected shall make application for the certificate of occupancy upon such forms as the commissioner of Buildings and Inspections shall provide. The certificate of occupancy shall then be issued by the commissioner of Buildings and Inspections within two weeks after receipt of the application.

In other cases a certificate of occupancy shall be issued by the commissioner of Buildings and Inspections upon satisfactory proof being submitted by the applicant that the nonconformity as to bulk or use was legally established prior to the amendment of the ordinance creating the nonconformity as to bulk or use. Satisfactory proof shall also be established that such nonconforming use has not been adversely ruled upon by the commissioner of Buildings and Inspections, the Board of Zoning Adjustment or by a court of competent jurisdiction. The commissioner of Buildings and Inspections shall receive all competent evidence submitted, shall have inspected the building, structure or use which is the subject of the application and shall render his decision in writing either granting or denying the certificate, which decision shall include the basis for this determination.

An appeal may be taken by the applicant or any interested party in accordance with the provisions of section 65.310 R.O.K.C.1956.

If no appeal is taken within 30 days from the date the decision of the commissioner of Buildings and Inspections is rendered, the decision of the commissioner shall become final and any certificate of occupancy issued shall establish the building, structure or use as a legal nonconforming use.

Any building, structure or use made nonconforming as to the provisions of this ordinance by any amendment thereof on or after the effective date of this amendment which fails to obtain the certificate of occupancy as provided in this section, shall be null, void and illegal and the continuance of such nonconforming building, structure or use shall be in violation of this ordinance and shall be prohibited." [2]

The majority opinion concludes that the failure of the Codes Administrator to perform his duty pursuant to the above-referred-to ordinance is beyond the scope of review by this court. In adopting such a position, the majority opinion overlooks parts of the evidence of the record which established that such action by the Codes Administrator is required by the ordinance to perform certain functions and that in this particular case the Codes Administrator failed to follow the ordinance. More importantly, by its conclusion, the majority opinion, for all intents and purposes, renders null and void Kansas City, Missouri Rev.Ordinance § 65.230(8).

As the evidence on the record shows, by testimony of the Codes Administrator himself, if any application for legal nonconforming use is confronted by a counter-affidavit, he (the Codes Administrator) takes no further action. By such a policy or practice, no validation of either the original

2. Kansas City, Missouri Rev. Ordinances, Chapter 65, § 65.230(8).

application or the counter-affidavit ever occurs, and this is in direct violation of Kansas City, Missouri Rev.Ordinances, § 65.-230(8). One might speculate that the no further action taken by the Codes Administrator inferentially establishes validity in the opposing or counter-affidavit. The ordinance is specific as to what must be done, and to dismiss that requirement as not being within the scope of review by this court simply cannot be justified when upon the record this question was brought to the attention of the Board by the cross-examination of Codes Administrator. It is logical to infer that when the Codes Administrator took no further action after receiving the counter-affidavits, that those affidavits, unto themselves, were valid on their face. There is no evidence on the record to support the validity of the counter-affidavits.

Even with the violation of the above-referred-to ordinance aside, the evidence in this case simply is not competent and substantial enough to support the action of the Board.

Unlike the majority opinion, I feel it is of prime importance to specifically refer to the evidence in this case. As the majority opinion points out in *Brooks v. General Motors Assembly Division*, 527 S.W.2d 50, 53, ". . . the weight of the evidence is not the quantity or the amount thereof." The majority opinion also includes the point made clear in *Brooks v. General Motors Assembly Division, supra* that the decision of the Board must be supported by competent and substantial evidence. The *Brooks* case also points out that if the evidence, even though competent and substantial, is not supportive of the decision of the administrative body, the decision cannot stand.

A review of the specific evidence in this case is a must and that review is set forth below under the evidence presented by the respective parties. Before presentment of specifics of the evidence, however, it must be pointed out that appellant herein had the burden of establishing a legal nonconforming use prior to or upon June 4, 1933 in conformity with the city zoning require-

ments. In addition, appellant carried the burden of showing consistent nonconforming use without interruption for periods of not more than twelve months or twenty four months.[3] The period of interrupted use, referred to as abandonment of use, is unclear in this case because of the unclear reference made to the city ordinances. Whether one considers twelve months or twenty four months, the evidence presented by respondents fails to support an abandonment of use anyway, as will be seen in reference to the evidence.

One other factor must be mentioned which is not referred to in the majority opinion. The parties herein entered into a stipulation of facts. Within that stipulation, which is a part of the record, the parties agree that the issue is to be that of legal nonconforming use. This was expressed as item number 17 of the stipulation.

This case was argued twice before this court, once in division and later en banc. At neither time did either party make but a passing reference to the issue of discontinued use or abandonment of use of the premises owned by appellant.

That the respondents attempted to persuade the Board that the premises in question had not continuously been used as a multi-purpose dwelling is unquestioned. The issue is whether the evidence presented was competent and substantial in the proof of that claim.

### APPELLANT'S EVIDENCE

Appellant Ruth Murphy, owner of the premises, appeared and testified under oath. She testified she has owned the property since 1959. She testified she first visited the property in 1925, that she was related to the owners of the property in 1930 and that said property had been used for and as a multiple-dwelling property since 1930.

In further support of her claim, she introduced, without objection, an affidavit of

---

3. See Kansas City, Missouri Rev. Ordinances, Chapter 65, § 65.230(7)[a], [b] and [c].

one Birdie Sharples.[4] That affidavit stated that relatives of Birdie Sharples had owned the property since 1911 and that the property had been used as rental property since at least 1930 and continuously since then.

Appellant entered into evidence, without objection, the affidavit of Bea Billingsley (at the time of the hearing she was a resident of California) which established she had been a tenant in the premises from 1930 to 1952. In addition, the affidavit of a Della Hill established she was a tenant in said premises from 1932 to 1957. The record further establishes that the City Codes Administrator's Index System showed a previous affidavit of a Raymond Shibelsky as a tenant in said premises from 1934 to 1961. A Luther Boyt testified at the hearing that he had been a tenant in the premises since 1966. He further testified that years earlier, while in high school, he had visited the property with his parents and had observed occupancy by tenants.

At this juncture, appellant's evidence could be summarized as positive, direct and substantial evidence that on or prior to June 4, 1933 and continuously since then, the property had been in use as a multiple-dwelling residential property.

### RESPONDENT'S EVIDENCE

In opposition, five witnesses appeared. In addition, over objection, an affidavit of one Robert Olson was introduced. Of particular import was the part of the Olson affidavit which contained a statement of what Olson's mother had told him (Olson) about the property. This was hearsay upon hearsay since the record showed that Olson, at the time, was living in and was a resident of the area. On appeal, respondents do not dispute the inadmissibility of the Olson affidavit, but be that as it may, the fact remains the affidavit and the reference statements made by Olson's mother were, in fact, presented to the Board.

Donald Chisholm was called to testify. He stated he acted as legal counsel for the estate of one of the previous owners. In his capacity as counsel for the estate, he visited the property in late 1958. He testified he saw no tenants and that in April 1959, as attorney with assistance from a realty agent, sold the property. The sum total of time of his connection with the property was no more than seven months. His testimony consisted of the inventory of furnishings in the premises. The record reveals he was asked the following questions:

"MR. KUMIN: Sir, may I ask you first, you went out to the house on that occasion, you saw the furniture. Now, do you have any personal knowledge as to whether or not that furniture located there, had been located there for any substantial period of time before or whether back in 1957 that property and the furniture was moved from Iowa back to the premises for a short period of time?

MR. CHISHOLM: I have no knowledge

\*  \*  \*  \*  \*  \*

MR. KUMIN: You don't know for a fact that it was just there just a week prior to the time?

MR. CHISHOLM: It didn't appear to have been moved during the last week, but I have no knowledge of this."

At this juncture, it can be concluded that respondents' testimony amounted to the testimony of Mr. Chisholm, who visited the premises on only one occasion and who was attorney for the decedent's estate for not more than seven months. His testimony does not reveal any first hand observation of tenants or lack thereof, except for the one-time visit when he made the furniture inventory.

At this point, appellant was permitted to resume the witness chair and she explained the presence of the furniture referred to by Mr. Chisholm. Appellant advised the Board the furniture was part of the property left in the estate of the owner and the furniture was removed from the residence of the deceased owner in Iowa to the premises in question in these proceedings.

4. Birdie Sharples was deceased at the time of the hearing.

The proceedings before the Board then took on a rather unusual form in that Mr. John Thornberry presented a narrative statement which read as follows,

"MR. THORNBERRY: No, sir. I want to introduce some more [testimony]. In the first place, I think the Kinneys bought the property in 1935 and lived there until they sold it, or it was sold in the estate. Consequently, I am relatively sure, that they must have had adequate furniture because we moved, the Thornberrys moved in there in 1942, when the Kinneys had just then moved up to Iowa for part time, having left the place permanently, and Mr. Hill and Mrs. Hill were staying there as a secretary and supervisor of the place, and they had a man named Curtis who was the yard man living in the garage, so there is no evidence whatsoever from 1942 on that the place was rented out to anybody and was in use by these caretakers, and after the property was sold to Kinney there was obviously no use of it as such, until he could have left the premises because he was much to [sic] well off to be renting rooms to anybody or operating a business there."

This narration was objected to. Following this, Mr. Thornberry narrated again, this time saying (with interruptions of statements of the Chairman of the Board and applicant's counsel),

"MR. THORNBERRY: I was curious about the affidavit from Bea Billingsley as to what relationship she is in this situation and her age.

CHAIRMAN: Mr. Thornberry, I think the relationship be in order but as to age, I think that would not be proper so I would like to ask Mr. Kumin here the relationship.

MR. KUMIN: Mrs. Billingsley was simply a resident there, there is no blood relationship whatsoever with the owner of the property."

At this point in the hearing, a Mrs. Bette Hetzel took the stand. Her testimony was to the effect that she had been a resident near the questioned premises since 1957 or 1958. During that time, she would take her small children and walk about the neighborhood. She talked with the caretaker of the questioned premises. She testified she was inside the premises on one occasion. Her recollection of the premises was that of a big beautiful lovely home with one kitchen. In 1957, 1958 or 1960 (this witness, from the record, appeared confused as to the exact dates) she saw many changes come over the property, such as the renewal of some of the cement, "the garage doors go down and commence to build up" and other changes.

On cross-examination, after denying any personal animosity toward appellant, witness Hetzel testified,

"MR. KUMIN: Are you, or have you ever opposed the rezoning of that property?

MRS. HETZEL: Very definitely."

Then, further in her testimony upon cross-examination, the record reveals the following:

"MR. KUMIN: It was my impression that you said there was no tenants?

MRS. HETZEL: No, I didn't say there was no tenants. I said there was no one renting apartments in there, because there was one, one, one kitchen in there. I remember well."

At this point, this witness was questioned on the accuracy of her recollection of dates as to when the property was sold and when she went through the property in person. She placed the sale in 1960 and her visit through the premises in 1957 or 1958.

At this point, the record shows witness Chisholm in the premises on one occasion, the sale of the property in 1959, witness Hetzel's statement that there were no apartment renters (but she did not say there were no tenants) and witness Hetzel's recollection of the exact configuration of the internal parts of the property. Due to memory lag, however, she could not put the dates of her visit to the premises and the sale of the premises in their proper sequence.

Then, for respondent, witness Doris Parker took the stand. This witness was asked if she had ever lived in the questioned

premises and she answered yes. Her testimony, however, was not that she ever lived in the premises, rather, in 1957 she toured the premises as a potential purchaser. On cross-examination, this witness asserted repeatedly the property was for sale in 1957. This, at best, served only to contradict the testimony of witness Chisholm, who testified to the date of 1958. Witness Parker added further that there was only one kitchen in the premises.

The majority opinion concludes that respondent's witness Tucker testified to multiple use of the premises commencing in 1960. This is an erroneous conclusion or assumption in the majority opinion not supported by the evidence. The sum total of Tucker's testimony was his having looked at city directories for the years 1915–1925 (these directories were at the public library) and his conclusion that these directories proved single family use. That testimony fails to support the conclusion declared in the majority opinion and that evidence should have been discarded completely as a most blatant form of hearsay.

The evidence of the record does not establish that witness Hetzel indicated nonuse between 1955–1958, because she was not even a resident of the area until 1957. Further, her testimony conflicted as to the dates of 1957–58 or 1960 and failed to establish one way or another if there were tenants in the premises in conformity with the city ordinances. In fact, she testified she did not "say there were no tenants . . . ."

As to the Thornberry testimony, rather than establishing nonmultiple use (because he testified he was never inside the premises), it was premised upon Thornberry's conclusion that since the owner was wealthy, the owner would not rent his premises. This is established in his testimony within this dissent.

Respondents then called witness George Tucker. This evidence is not of particular import on the merits of the issue herein, but serves to illustrate the nature and manner of the entire hearing on this issue. Mr. Tucker's testimony, being brief, is set forth herein.

"MR. TUCKER: My name is George Tucker, I live at 80 Janssen Place. When this place—

MRS. HAUSER: Have you been sworn?

MR. TUCKER: Yes, I have been sworn. When it came up for—when we first found out about the nonconforming use for number 20 Janssen Place, I went down to the City library and went through the old city directories from 1910, '15, 1920. Basically, the City Directory showed that it was a single family with caretaker until 1957, '58, when it actually changed when it turned to multifamily it was 1960. When we started to see an increase in the number of people in number 20 Janssen Place.

CHAIRMAN: And that is all your testimony?

MR. TUCKER: (Nodded head).

CHAIRMAN: Does counsel have any questions?

MR. KUMIN: First, I want to object to the testimony. He is attempting to introduce something that he had absolutely nothing to do with the preparation of. He cannot testify as to its accuracy, that it was any exception to the hearsay rule which is applicable to administrative hearing, and therefore must object to that testimony being considered by the Board.

CHAIRMAN: You are objecting to the fact that he personally verified the city directory's information that was obtained from the city directories?

MR. KUMIN: He has simply taken something from the city directory but he is incapable of testifying that that is accurate or an accurate portrayal of the premises. I think that any of you could take notice that if you refuse to turn in information they show you as not being there or that it is not being occupied. He cannot testify that that was accurately prepared and that accurately portrays what was in existence at that time.

CHAIRMAN: The chair overrules the objection, taking note of the fact that the value of the city directories to its accuracy, and so forth. Objection overruled."

This concluded the evidence for respondents, except for a narrative declaration made by witness Thornberry, which in the opinion of this writer, reflects the underlying struggle presenting itself before the Board, both prior to and at the time of the hearing.

"MR. THORNBERRY: One other facet and then we will be ready to close our part. Quite sometime ago, Mr. Tucker, Mr. Costlelight, Mr. Hetzel began an effort to work themselves and Janssen Place into the strain of a historical site recognition. After surveying that possibility they did prepare such documents and Mr. Tucker had that submitted to the city for its approval and sent it on to the state where it was approved and it is now in Washington and Congressman Bolling says it will probably take another sixty days before final decision. It seems to us that what is going on in city with the people departing for the suburban areas that every effort should be made to maintain the quality of life such as in Janssen Place and has been in there for a good many years, rather than permit it to deteriorate by overloading it with numbers of smaller apartments or rooming situations and number of cars in the street. There is a valuable asset, historically, esthetically, and economically and in Swift Avenue of Dallas, and a similar situation in St. Louis just recently portrayed here by people who have had first hand experience, they have demonstrated how all these values coming out that it is economically wise to create these historical areas and to have proper zoning protecting it. Had the zoning been insisted upon, had it been kept up, Janssen Place would have been in better today as far as the economics situation is concerned. But it obviously will affect the surrounding territory and help to improve it too, and we need the tax base and we cannot afford to throw that away. I hope you will give full consideration to the esthetic and historic values as well as the economic situation that has been created by this overloading by this violation of the Zoning Ordinances as they stand.

CHAIRMAN: That concludes your testimony?

MR. THORNBERRY: Yes.

MR. KUMIN: I am sorry to belabor the point, gentlemen, but again for the record I must object and have stricken out all of his testimony that he just gave, none of it is in any way relevant to the only issue here today, which is, has my client established a legal nonconforming prior use. This is not a request for rezoning. The esthetic, economic and other values and considerations which I appreciate are very valuable at a rezoning hearing, are not for consideration as the Zoning Ordinances of Kansas City, Missouri, state in such a fashion that if she establishes by a burden of proof that she has a legal nonconforming use, it is mandatory that the Certificate be granted, it is not discretionary upon such things as the community feelings. This is a legal right under what has commonly, has been referred to as the grandfather clause. What I am respectfully saying I don't think that is appropriate for consideration by the Board.

CHAIRMAN: Objection has been noted and you are overruled and the Board will take into consideration that which you stated. Any further testimony? Does anyone have anything further to state before we complete the case?"

It is from the foregoing that this court concludes in the majority opinion that there was competent and substantial evidence to uphold the ruling of the Board. The evidence upon the record simply fails to uphold the majority opinion.

Appellant's evidence, presented by both personal witness and proper affidavit, clearly established a legal nonconforming use as of June 4, 1933 and a continuous use of the property in conformity with the city ordinances.

On the other hand, if as concluded in the majority opinion the hearsay evidence, by way of affidavits and testimony of the contents of city directories is excluded, the sum total of respondents' evidence does not, by

substantial and competent evidence, establish that the use of the property, effective June 4, 1933, was not then a legal nonconforming use. Moreover, the remainder of respondents' evidence fails to establish that interruption, nonuse or abandonment ever occurred, much less whether such abandonment continued as required under the ordinance for a continuous period of twelve months or more.[5]

When reviewed in total, by virtue of the stipulation agreed to by the parties, abandonment was really never an issue before this court, but assuming for purposes of argument that abandonment was an issue pursuant to the city ordinances, such abandonment, under the ordinances, had to be shown to be continuous for a period of twelve months or more. There was no evidence of a direct, substantial or competent nature to establish abandonment of use as prescribed under the ordinances.

The majority opinion concludes the only evidence in support of appellant's position was the affidavit of appellant herself. The evidence on the record, as pointed out herein, refutes that conclusion on the face of the record.

While it is true that the laws of our state support the rule that credibility of witnesses is a matter for the trier of fact, and by virtue of the rulings and the trial court herein, the evidence must be reviewed in a light most favorable to those lower rulings, the majority opinion merely concludes there was competent and substantial evidence to support the finding by the Board. The only thing wrong with this conclusion is the evidence on the record fails to support the conclusion.

The decision of the trial court should be reversed and this cause should be remanded to the Board of Zoning Adjustment with directions to forthwith issue a certificate of legal nonconforming use to the favor of appellant. Such ruling is the only one possible and is supported by the evidence before this court.

---

5.  See Kansas City, Missouri Rev. Ordinances, Chapter 65, § 65.230(7)[a], [b], and [c].